## Shankey v. Staisey et al., Appellants.

Argued September 30, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Edward Friedman,* Counsel General, and *Francis A. Barry,* Deputy County Solicitor, with them *Thomas M. Rutter, Jr.,* Assistant County Solicitor, and *William C. Sennett,* Attorney General, for appellants.

*John H. Neely,* for appellees.

OPINION PER CURIAM, October 2, 1969:

The order of the Court of Common Pleas of Allegheny County, Civil Division, is reversed and the action of the Board of Elections of Allegheny County is sustained. Opinion to follow.

OPINION BY MR. JUSTICE COHEN, October 27, 1969:

At issue in this case is the constitutionality of Act No. 17, Section 1 of 1968 known as The Amending Act of 1968, March 13, P. L. , Section 1, amending the Act of June 3, 1937, P. L. 1333, Art. XIV, Section 1405 (25 P.S. §3155 [Supp. 1969]).[1] As amended, that statute says: "The county board, in computing the votes cast at any primary or election, shall compute and certify votes cast on irregular ballots exactly as such names were written, stamped, affixed to the ballot by sticker, or deposited or affixed in or on receptacles for that purpose, and as they have been so returned by the election officers. In the primary the county board shall not certify the votes cast on irregular ballots for

---

[1] Similar statutes have been enacted by Arizona, A.R.S. §16-571(c) (Supp. 1969), and California, West's Ann. Election Code, §6661 (1961), but the constitutionality of neither has been tested. As to the proper construction of the former, see *Board of Supervisors of Maricopa County v. Superior Court,* 4 Ariz. App. 110, 417 P. 2d 744 (Ct. of App. of Ariz. 1966).

any person for a county, city, borough, town, township, ward, school district, election or local party office unless the total number of votes cast for said person is equal to or greater than the number of signatures required on a nomination petition for the particular office."

There is no dispute as to the facts in the case. The Constitutional Party, having received sufficient votes at the election preceding the May 20, 1969, primary, is a legal county party under the Act of June 3, 1937, P. L. 1333, Art. VIII, Section 801, as amended by the Act of July 28, 1941, P. L. 526, Section 1 (25 P.S. §2831(b)). It was thus entitled to "nominate all its candidates for office in such [Allegheny] county and in all political districts within said county." None of the appellees filed nomination petitions but all received the highest number of votes cast for various offices in Allegheny County by electors of the Constitutional Party, their names having been "written in." The County Board of Elections refused to certify the votes cast for appellees for the named offices because the number of votes cast for each did not satisfy the requirements of §1405.

Plaintiffs-appellees brought a mandamus action in the Common Pleas Court of Allegheny County to require the Board to certify the votes cast for plaintiffs for a place on the ballot. The lower court found that the statute in question violates Art. I, Section 5 of the Pennsylvania Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We reverse.

It is clear that the legislature may enact laws governing the conduct of general and primary elections. *Winston v. Moore*, 244 Pa. 447, 455 (1914); 25 Am. Jur. 2d Elections §150 (1966). It is also clear that no legislative enactment may contravene the requirements of the Pennsylvania or United States Constitu-

tions. Article I, Section V of the Pennsylvania Constitution requires that "elections . . . be free and equal." It has never been expressly decided whether that clause applies to primary elections, and in light of the conclusions we reach, it is not absolutely necessary to decide the point. However, in view of the central role primary elections play in the electoral process and the crucial importance of that process to our form of government, it is difficult to see how a practice could be sustained which provided for something other than "free and equal" primary elections. Assuming, therefore, that the clause applies to primaries, it is necessary to see how this statute fulfills its requirements: "In a general way it may be said that elections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, and when no constitutional right of the qualified elector is subverted or denied him." 244 Pa., supra at 457. There seems no question as to "freedom"; each voter can vote for whomever he chooses. The complaint is as to "equality"—that the statute wrongfully equates public petitions with secret ballots so as to deny the ballots of people who voted for appellees the same weight as the ballots of people who voted for major party candidates. The statute, however, promotes "equal" elections by requiring every candidate who desires to appear on the general electoral ballot to have satisfied the same condition—the show of support by a set number of people. This can be done by petition or by primary election victory, and what is important is not that ballots and petitions are equated but that the number of people behind each are equated. Any other sys-

tem would create unequal elections by giving minority party candidates and their supporters the advantage of not having to secure the same showing of public support before being put on the ballot as required by a majority party candidate.

It is also alleged that the statute violates the Equal Protection Clause of the Fourteenth Amendment. There are two classifications contained in the statute which must bear analysis. One is the distinction as to placement on the general election ballot between those who have shown the mandated amount of public support, whether by petition or votes in the primary, and those who have not. The other is the distinction between county and local elections, to which the statute applies, and state-wide elections, to which it does not. It is the generally accepted rule that the Equal Protection Clause is satisfied when there is a reasonable basis for the classification created and that a scheme must be stricken down when its distinctions are "invidious." *Williams v. Rhodes,* 393 U.S. 23 (1968) ; 16A C.J.S. Constitutional Law §505 (1956).

As to the first classification created by Section 1405, there appears to be a reasonable basis for the legislature's action. What this Court must consider is both the right of the elector to vote for the candidate of his choice and the right of a candidate to have his name appear on the ballot. By providing for write-in votes, the Election Code gives every elector the right to vote for whomever he chooses. The right of a candidate to have his name on the ballot is not such an absolute one, however, because there is a competing interest at stake—the avoidance of an unduly complicated ballot which may confuse the voter and make impossible the use of voting machines. The legislature has taken this interest into account by creating a two-tier system a candidate must satisfy before his name may appear on the ballot. First, his party must become a legal state

or county party under the requirements of the Act of June 3, 1937, P. L. 1333, Art. VIII, §801, as amended by the Act of July 28, 1941, P. L. 526, §1 (25 P.S. §2831). Then the individual must show a minimum of public support either through a nomination petition (§912) or through the votes received at the primary (§1405). The legislature felt that a candidate should have to show at least this much public support before he deserved a spot on the ballot.

In past cases this Court and other courts have recognized the avoidance of a cluttered ballot and the possible necessity of using paper ballots rather than voting machines as a legitimate and reasonable goal of public policy. In *Kerns v. Kane*, 363 Pa. 276, 283, 69 A. 2d 388 (1949), this Court said: "Sec. 801 [25 P.S. §2831] was designed to prevent election ballots and voting machinery from being cluttered with the names of inactive or defunct political parties and their candidates,—a condition that can become especially serious in connection with voting machines . . . ." See also, *Winston v. Moore*, supra; *State ex rel. McGrael v. Phelps*, 144 Wis. 1, 128 N.W. 1041 (1910).[2] Thus, when the legislature has created a distinction between those showing a certain minimum of public support and those who do not, it has created a classification that meets the requirements of the Equal Protection Clause.

The second classification arises from the statute's nonapplicability to state-wide elections as by its terms it only applies to city, county, borough and other local contests. It appears that this distinction is related

---

[2] The emergence of the two-man Youngman Party which sought a spot on the ballot in *Youngman v. Lycoming County Board of Elections*, No. 865 May Term, 1969, Mandamus, Court of Common Pleas of Lycoming County shows that the cluttering problem can be a very real and immediate one.

to distinctions created in 25 P.S. §2831 pertaining to the definition of political party. Under that section a "political party within the State" is defined as one receiving at the last general election "in each of at least ten counties of the State not less than two per centum of the largest entire vote cast in each of said counties for any elected candidate, and polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate." A "political party within said county" which the Constitutional Party is, is defined as one whose candidates "polled at least five per centum of the largest entire vote cast for any elected candidate."

Although the percentage required for a "state" party is lower than that for a "county" party, in absolute terms the former requires a much greater showing of public support. The legislature could have felt that this requirement was great enough in absolute terms to outweigh any possibility of cluttering the ballot (without a test like that of §1405) while the same was not true of the "county" requirement. It may have felt a party could more easily fulfill the "county" than "state" requirement and thus saw the need for the second "tier" test imposed by §1405 as to local elections. It is not for this Court to pass on the wisdom of such legislation; it is our duty to determine whether the classification is reasonable, and it is our conclusion that this statute meets the standards imposed by the Equal Protection Clause.

The lower court and appellees lay great stress on the recent United States Supreme Court case of *Williams v. Rhodes*, 393 U.S. 23 (1968). That case is distinguishable, however, and does not control this situation. Involved there was the placement on the general election ballot of presidential electors, and in his concurring opinion Mr. Justice Douglas describes the obstacles Ohio placed in the path of new political

parties and independent candidates—393 U.S. at 35-40. The United States Supreme Court held that no state can enact laws regulating elections which violate the Equal Protection Clause and said that Ohio had acted unconstitutionally because it placed burdens on two "kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." 393 U.S. at 30. The United States Supreme Court does not say which particular sections of the statute offend the Equal Protection Clause but makes the following enigmatic statement: ". . . the State is left with broad powers to regulate voting, which may include laws relating to the qualification and functions of electors. But here the totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause." 393 U.S. at 34.

Pennsylvania does not burden the rights to vote and associate as Ohio did, and thus the *Williams v. Rhodes* holding is not controlling. First, as to the right to vote, Justice BLACK in stating "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." in 393 U.S. at 31 was referring to Ohio's prohibition of write-in votes. Ohio Rev. Code §3505.03 (1960). Pennsylvania's Election Code specifically provides for write-in votes as to both primary, Act of June 3, 1937, P. L. 1333, Art. X, §1002, as amended, Act of August 13, 1963, P. L. 707, §16 (25 P.S. §2962 [Supp. 1969]), and general elections, Act of June 3, 1937, P. L. 1333, Art. X, §1003, as amended by the Act of August 13, 1963, P. L. 707, §17, as amended by the Act of July 16, 1968, P. L.    , §1 (25 P.S. §2963 [Supp. 1969]).

74

When speaking of freedom of association, the United States Supreme Court was referring to the maze of Ohio statutes which operated to keep new parties off the ballot. Two important provisions distinguish the Pennsylvania holding from the Ohio pattern. First, "A candidate who seeks a place on the Ohio presidential ballot must first compile signatures of qualified voters who total at least 15% of those voting in the last gubernatorial election." 393 U.S. at 36. Under the Pennsylvania Code, §801, a party need receive only 5% county-wide to be a "county" party to participate in the next primary election. Then in order to have the names of its candidates placed on the general election ballot (the question at issue in this case), it need only meet the requirements of §912 or §1405, which are certainly nominal when contrasted with the Ohio provision. The Supreme Court does not say a state can impose no such requirements. In his dissenting opinion, Chief Justice WARREN says: "Although both opinions treat the Ohio statutes as a 'package', giving neither Ohio nor the courts any guidance, each contains intimations that a State can by reasonable regulation condition ballot position upon at least three considerations—a substantial showing of voter interest in the candidate . . ., a requirement that this interest be evidenced some time prior to the election, and a party structure demonstrating some degree of political organization. . . ." 393 U.S. at 69, 70. In its percentage requirements, the Pennsylvania test seems clearly reasonable.

Secondly, the Ohio statute treated old and new parties differently. Once a group became a political party, it only had to receive ten percent of the votes cast for governor at each election to remain such. Ohio Rev. Code, Ann. §3517.01 (1960). To attain the status of a party, however, a group had to secure signatures equal to fifteen percent of the vote. This favoring of

the status quo could have been found a violation of the Equal Protection Clause. See 30 Ohio State Law Journal 202, 211 (1969). Pennsylvania, however, treats old and new parties alike, subjecting each to the requirements of §§801, 912 and 1405. Thus, it seems clear that Pennsylvania does not burden the freedom of association at all in the way Ohio did and that what regulations do exist are valid, reasonable ones.

Although, narrowly construed, what is at issue in this case is the validity of §1405 and not the whole Election Code. It was necessary to make this analysis because §1405 is part of a general scheme and because *Williams v. Rhodes* does raise basic questions about the power of states to regulate their ballots.

Having considered all of appellees' arguments, it is the decision of this Court that §1405 is constitutional and that the judgment of the court below must be reversed.

Order reversed.

Mr. Justice ROBERTS dissents.

Mr. Justice POMEROY took no part in the consideration or decision of this case.