In re NOMINATION PAPERS OF Marakay ROGERS, Christina Valente and Carl J. Romanelli as Candidates of an Independent Political Body for Governor, Lieutenant Governor and U.S. Senator in the General Election of November 7, 2006.

**William R. Caroselli, Fred R. Levin, Daniel J. Anders and Peter D. Winebrake, Petitioners.**

Commonwealth Court of Pennsylvania.

Heard Aug. 30, 2006.

Decided Sept. 8, 2006.

Publication Ordered Sept. 27, 2006.

Clifford B. Levine, Pittsburgh, for petitioners.

Lawrence M. Otter, Doylestown, for respondents.

OPINION BY President Judge COLINS.

Before the Court is Candidate Carl Romanelli's challenge to Section 951 of the Election Code,[1] 25 P.S. § 2911, which requires that a minor party candidate for statewide office at the 2006 General Election submit nomination papers containing 67,070 valid signatures. This number is

---

1. Act of June 3, 1937, P.L. 1333, *as amended.*

calculated under Section 951 by taking two (2 percent) of the "largest entire vote for any elected candidate in the State at large in the last preceding election at which State-wide candidates were voted for." We previously determined that the relevant "last preceding election" was the election of Bob Casey, Jr. as Treasurer in the 2004 General Election rather than the retention election of Justice Sandra Shultz Newman in the 2005 Municipal Election. See *In re Nomination Papers of Rogers, et al,* Pa.Cmwlth. No. 426 M.D.2006, filed August 24, 2006, *petition for permission to appeal pending,* No. 122 MM 2006. Because Casey garnered 3,353,489 votes in that election, we agreed with the Secretary of the Commonwealth that the 2 percent rule required 67,070 valid signatures.

■ Candidate Romanelli (Candidate) now argues that the 2 percent requirement of Section 951 is unconstitutional under both the federal and state constitutions. Prior to discussing the history of Section 951 and the relevant authorities, we first must note and dismiss Objectors' contentions that the constitutional challenge is barred by estoppel or laches. In *Rogers v. Cortes,* 426 F.Supp.2d 232 (M.D.Pa.2006), the federal district court denied a preliminary injunction to the Green Party and its then-candidate for Governor, Marakay Rogers, who sought to invalidate the 2 percent requirement on federal constitutional grounds. The denial of the preliminary injunction was recently affirmed by the Third Circuit Court of Appeals in *Rogers v. Corbett,* 460 F.3d 455 (3d Cir.2006). Notably, Carl Romanelli was not a party to that litigation. Nonetheless, objectors argue that principles of estoppel should still apply since the Green Party stipulated in federal court that 67,070 signatures were required, and Romanelli is "in privity"

with the Green Party. While such an argument may have prevailed against Marakay Rogers, who was initially a party in both this proceeding and the federal litigation but who later withdrew her nomination papers, we cannot agree that Romanelli is estopped by the federal litigation, as he was not a party to that litigation. Moreover, although Romanelli may be a candidate of the Green Party, the present objections do not name the Green Party and do not seek to challenge the entire slate of Green Party candidates. Accordingly, we find that Romanelli is neither estopped by the federal litigation nor is he barred by laches from raising his constitutional challenge at this time.

■ Although we do not find that the federal litigation bars Romanelli from raising his constitutional challenges, we do agree with the federal courts that the 2 percent requirement is not unconstitutional under the U.S. Constitution for reasons stated by those Courts.[2] Therefore we are left with Romanelli's challenge to Section 951 under Article I, Section V of the Pennsylvania Constitution. To fully appreciate that challenge, a review of Pennsylvania's requirements for minor party ballot access is instructive.

The General Assembly adopted Section 951 in 1937 concurrent with its enactment of the Pennsylvania Election Code.[3] At the time of its adoption Section 951, 25 P.S. § 2911, provided in pertinent part as follows:

(b) Where the nomination is for any office to be filled by the electors of the State at large, the number of qualified electors of the State signing such nomination paper shall be at least equal to **one-half of one percent** of the largest entire vote cast for any elected candidate in the State at large at the last preceding election at which State-wide candidates were voted for.

(Emphasis added.)

As with most legislative action in Pennsylvania, there is scant legislative history regarding the policy decisions behind various provisions the General Assembly adopted in the Election Code. The legislative history of the 1937 Act adopting the Code contains no remarks from either the House or Senate suggesting the reason why the General Assembly incorporated this provision, or why it chose the .5 percent figure for nomination signatures.

The .5 percent signature requirement remained the same until 1971, when the General Assembly amended Section 951 by the Act of December 22, 1971, P.L. 618, which increased the number of signatures required from .5 percent to 2 percent, a 200 percent increase in the requisite number of signatures for third-party candidates.[4]

However, as the Candidate points out, at the time the General Assembly amended Section 951, Section 801(a) and (b) of the Election Code appear to have allowed minor parties to hold primaries for state-wide elections if a candidate for their political

---

**2.** We note that decisions of lower federal courts are not binding on this Court, even when the issue concerns the federal constitution. *Finnegan v. Pa. Bd. of Probation & Parole,* 576 Pa. 59, 838 A.2d 684 (2003). However, we are persuaded by the analysis of the Third Circuit in *Rogers v. Corbett,* and adopt this analysis in this matter.

**3.** Act of June 3, 1937, P.L. 1333, *as amended.*

**4.** As with the original adoption of Section 951, neither house of our General Assembly included any discussion in their respective chambers of the amendment. Nor did research disclose the existence of committee reports or transcripts of hearings on this provision.

organization received more than 2 percent of the vote of the largest state-wide vote cast at the next preceding election. Other candidates or parties who did not receive the requisite number of votes had to proceed under Section 951 in order to place a candidate on the ballot.

In 1986, the General Assembly added to the Election Code Section 912.2 by the Act of February 19, 1986, P.L. 29, 25 P.S. § 2872.2(a). This section added the following definition of "minor political" parties: "a political party as defined in Section 801(a) or (b) whose State-wide registration is less than fifteen per centum of the combined State-wide registration period immediately preceding the most recent November election." Section 801(a) and (b), 25 P.S. § 2831(a) and (b), as previously suggested, define political parties as:

(a) Any party or political body, one of whose candidates at the general election next preceding the primary polled in each of at least ten counties of the State not less than two per centum of the largest entire vote cast in each of said counties for any elected candidate, and polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate, is hereby declared to be a political party within the State, and shall nominate all its candidates for any of the offices provided for in this act, and shall elect its delegates and alternate delegates to the National convention as party rules provide.

. . .

(b) Any party or political body, one of whose candidates at either the general

or municipal election preceding the primary polled at least five per centum of the largest entire vote cast for any elected candidate in any county, is hereby declared to be a political party within said county; and shall nominate all its candidates for office in such county and in all political districts within said county, or of which said county forms a part, and shall elect such party officers as its rules provide shall be elected therein, by a vote of the party electors, in accordance with the provisions of this act.

Accordingly, before the adoption of this provision, if a party or political body satisfied the vote requirement of Section 801(a) and (b), they could engage in the primary election process rather than the process required under Section 951. Now, "minor political parties," as well as other individuals unassociated with a political organization, are all denied access to the primary election process, which allows participation by only "major political parties."

However, even under the previously applicable definition of political party, under Section 801(a) and (b), the burden upon such organizations to engage in the primary election process was onerous, as such organizations were required to show that they garnered the two per centum of votes cast in previous elections (in at least ten counties) in order to gain ballot placement on the state or five per centum of the votes cast at the previous election for ballot placement for a county and intra-county elective positions.

As a matter of historical interest,[5] in the 1966 gubernatorial election, two non-major parties (the Constitution and Socialist Labor parties) had candidates on the

---

5. The information related following this footnote was obtained from a web site created by Harold Cox of Wilkes University. The web site is found at

www.staffweb.wilkes.edu/harold.cox.

ballot. The third-party candidates obtained approximately 1.77 percent of the vote. Interestingly, in the 1970 gubernatorial election five non-major parties placed candidates on the ballot (Constitution, American Independent, Socialist Labor, Consumer, and Socialist Workers), whose candidates received a total of approximately 3.09 percent of the votes. This election preceded the 1971 amendment to Section 951.

Following the amendment to Section 951, third-party gubernatorial candidates (representing the Socialist Workers and Constitution parties) in the 1974 election together obtained only 1.23 percent of the votes. Similarly, in the 1978 gubernatorial election, the two third-party candidates (representing the Socialist Workers and Consumer parties) obtained 1.02 percent of the votes.

United States Senatorial elections in 1968 included three non-major parties (Constitution, Socialist Labor, and Militant Workers), who garnered a total of 2.31 percent of the vote. However, in 1970, a trend similar to that reflected in the gubernatorial election of 1970 resulted in a total vote for third-party candidates (representing the Constitution, American Independent, Socialist Workers, Socialist Labor, and Consumer parties) of 3.19 percent. Following the amendment to Section 951, there was only one third-party candidate for U.S. Senate (representing the Constitution Party), who obtained 1.10 percent of the vote. In the 1976 Senatorial election the Constitution and Socialist Workers parties placed candidates on the ticket who earned a total of .82 percent of

the vote. However, in the 1980 Senatorial elections there were three third-party candidates (representing the Socialist Workers, Consumer, and Libertarian parties) who obtained 1.48 percent of the vote.

These statistics, of course, establish nothing except to suggest that in 1970, before the General Assembly amended the signature requirement, more third parties were placing candidates on the ballot—five on the 1970 Senatorial ballot—and that, following the amendment, fewer third parties had candidates running, with a commensurate reduction in votes for third-party candidates. In the most recent presidential, senatorial, and gubernatorial elections, the number of third-party candidates was two or three (although there were four third-party candidates in the 2000 presidential election). We cannot venture to answer whether the legislative amendment to Section 951 reflects a legislative desire to exclude third-party candidates, or simply the generally proffered policy reason that voters may become confused when presented with a greater number of candidates.[6]

Thus, "political bodies" such as the Green Party, previously could participate in primaries only if they satisfied the former requirements of Section 801(a) or (b).

With this history of the ability of third parties to access the ballot, we now turn to Article I, Section V of the Pennsylvania Constitution, which provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." That "elections shall be

---

6. Section 801(c) explains how these political bodies placed candidates on ballots, presumably without satisfying the present definitional requirements of "minor political party," as it states that "[a]ny political body which is not a political party, as hereinabove defined, but which has nominated candidates for such general or municipal election by nomination papers in the manner provided by this act, shall be deemed to be a political body within the meaning of this act, but such political body shall not be entitled to nominate its candidates or elect its party officers at primaries held under the provisions of this act."

free and equal" has been a part of the Pennsylvania Constitution since 1776. The language concerning interference with the right of suffrage was added in 1874. Robert E. Woodside, *Pennsylvania Constitution Law*, 1985 at 457 (hereinafter *Woodside*).

Our Supreme Court has stated that the provision "enjoins the duty in the abstract but leaves the means of accomplishment in the concrete to the legislature. This necessarily gives the legislature a wide field for the exercise of its discretion in the framing of acts to meet changed conditions and to provide new remedies for such abuses as may arise from time to time. The power to regulate elections is a legislative one, and has been exercised by the general assembly since the foundation of the government." *Patterson v. Barlow*, 60 Pa. 54, 75 (1869).

Although cases on the Pennsylvania constitutional provision are not numerous, those reviewed in *Woodside* at pp. 457–461 reveal, as astutely stated by Judge Woodside, that "the courts have been reluctant to hold unconstitutional acts of the legislature concerning eligibility of citizens to vote and the regulation of elections." Id. at 460.

Of these cases, we find several of some relevance and guidance. In *Oughton v. Black*, 212 Pa. 1, 61 A. 346 (1905), the Supreme Court concluded that the free and equal exercise of the elective franchise is not impaired by a statute allowing straight party votes, finding that the statute was merely a convenience for certain voters.

Of somewhat greater interest is *Winston v. Moore*, 244 Pa. 447, 91 A. 520 (1914), in which the Supreme Court considered the constitutionality of an act providing for non-partisan nominations and elections of judges and all elected officials in cities of the second class. The Court first noted that prior cases

... show conclusively that our courts have never undertaken to impale legislative power on points of sharp distinction in the enactment of laws intended to safeguard the ballot and to regulate the holding of elections. Indeed, so far as we are now advised, no act dealing solely with the details of election matters has ever been declared unconstitutional by this court. This for the reason that ballot and election laws have always been regarded as peculiarly within the province of the legislative branch of government, and should never be stricken down by the courts unless in plain violation of the fundamental law.

· · ·

It is contended that the act under consideration is discriminatory and restrictive in its operation because it limits the names of candidates on the official ballot to the two who polled the highest vote at the primary. There is nothing new or novel in the provision thus criticized. If there is to be an official ballot, there must of necessity be a limit to the number of names printed thereon, else such a ballot would mean nothing.

· · ·

The Constitution says nothing about nominations, or how candidates shall be chosen, or how many names shall be printed on the ballot. It furnishes no rule by which to accurately determine what the Legislature may or may not do in the enactment of laws relating to such details in the exercise of the elective franchise. In the absence of any express constitutional limitation upon the power of the Legislature to make laws regulating elections and providing for an official ballot, nothing short of gross abuse would justify a court in striking down an election law demanded by the

people, and passed by a power always recognized and frequently asserted.

*Id.* at 455–57, 91 A. at 522–23.

In a somewhat more recent decision in *Shankey v. Staisey,* 436 Pa. 65, 257 A.2d 897 (1969), *cert. denied,* 396 U.S. 1038, 90 S.Ct. 684, 24 L.Ed.2d 682 (1970), our Supreme Court declined to strike a statute requiring non-cumulation of write-in votes, and further requiring that a write-in candidate receive a number of votes equal to or greater than the number of signatures required on a nomination petition for the particular office. In that case, the Constitutional Party, although authorized to nominate candidates in a primary election, had no candidates who filed petitions for various Allegheny County offices. The party argued, however, that several of its candidates had been "nominated" by write-in votes, although the candidates had failed to garner the minimum number of votes required by the Election Code.

The Supreme Court noted that the complaint in *Shankey* was that the challenged statute denied "equality" in that it wrong-fully equated public petitions (i.e., the number of signatures required to appear on a primary ballot) with secret ballots so as to deny the ballots of people who voted for write-in candidates the same weight as ballots who voted for major party candidates. The Court then concluded that the statute promoted "equal" elections by requiring every candidate who desires to appear on the general electoral ballot to have satisfied the same condition—the show of support by a set number of people. This condition could be accomplished by petition or by primary election victory, and "what is important is not that ballots and petitions are equated but that the number of people behind each are equated." 436 Pa. at 69, 257 A.2d at 899.

From *Winston v. Moore,* we find that our Supreme Court has applied a "gross abuse" standard to determine whether election statutes violate the "free and equal" clause, thereby giving substantial deference to the judgment of the legislature. This stands in stark contrast to the standard utilized under the federal constitution, which employs a "balancing test." [7]

**7.** In *Rogers v. Corbett,* the Third Circuit discussed the standard of review, stating:

At oral argument before us, the parties were questioned about the applicable level of scrutiny and whether *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), annuls, or otherwise changes, the familiar strict scrutiny, intermediate scrutiny, and rational basis classifications as applied to ballot access cases. First, we note that this Court, as well as others, has been unclear whether the *Anderson* balancing test applies to ballot access claims brought under the Equal Protection Clause, given that *Anderson* is a First Amendment case. See *Belitskus v. Pizzingrilli,* 343 F.3d 632, 643 n. 8 (3d Cir.2003). We clarify here that the *Anderson* test is the proper method for analyzing such equal protection claims due to their relationship to the associational rights found in the First Amendment. In *Belitskus,* we observed that we could not see any basis for refusing to so apply (Anderson).

*Id.;* see also *Reform Party of Allegheny Co. v. Allegheny Co. Dep't. of Elections,* 174 F.3d 305, 314 (3d Cir.1999) (assuming that "burdens require the same level of scrutiny in an equal protection analysis that they do in an associational rights analysis."). Likewise, our sister Circuits have applied *Anderson* to similar claims under the Equal Protection Clause. See, e.g., *Fulani v. Krivanek,* 973 F.2d 1539, 1542–44 (11th Cir. 1992); *Republican Party of Arkansas v. Faulkner Co.,* 49 F.3d 1289, 1293 n. 2 (8th Cir.1995) ("In election cases, equal protection challenges essentially constitute a branch of the associational rights tree."). As such, we conclude that *Anderson* sets out the proper method for balancing both associational and equal protection concerns and the burdens that the challenged law creates on these protections as weighed against the proffered state interests.

What then is the import of *Anderson* on the traditional three tiers of scrutiny? Although we appreciate that the strict scruti-

Our review of the history of ballot access for minor parties in Pennsylvania reveals what we view as the legislature's intent to make ballot access by these parties difficult, under the guise of maintaining an "uncluttered" ballot. The fact that the "magic number" of 2 percent fluctuates from one election to another is, in the mind of this jurist, somewhat problematic, in that the playing field is certainly not level and varies considerably depending solely on the number of votes cast for the winner in the last similar election. Nevertheless, the federal courts, utilizing a balancing test that subjects the challenged statute to significant scrutiny in order to determine whether it unduly violates constitutional rights, have not found Pennsylvania's system to rise to the level of a federal constitutional violation.

■ Our review of cases under the Pennsylvania Constitution leads us to the same result. Initially, we view the state standard as considerably less than that employed by the federal courts. According to *Winston v. Moore*, the General Assembly is vested with the responsibility of establishing a regime for ballot access, and its acts should be accorded a presumption of constitutionality, to be invalidated only for "gross abuse." While we may well question whether the "2 percent" is the best way to achieve the valid state interest of eliminating ballot clutter, we cannot conclude that the method chosen by the legislature constitutes a "gross abuse" of discretion. Like *Shankey*, a candidate may gain access to the General Election ballot either by winning a primary election or by gathering a set number of signatures. While the number of signatures for a minor party candidate is much higher than that required to appear on a partisan primary ballot, it is "equal" to the extent that it requires a set number of signers, determined under the 2 percent rule, for each candidate at a given election. Additionally, while this number is much higher than the number of signatures required to gain ballot access in a primary, this is not the proper number for comparison. In order to appear on the General Election ballot, the primary winners have demonstrated support not of the small number of persons who signed their nomination petitions, but of the substantially larger number of electors who voted for them in the primary election, in this case 629,271 who voted for Bob Casey, Jr. in the Democratic primary, and 561,952 who voted for Rick Santorum in the Republican primary.

Accordingly, we conclude that the challenge to Pennsylvania's "2 percent" requirement does not rise to the level of a violation of Article I, Section V of the Pennsylvania Constitution.

ny, intermediate scrutiny, and rational basis categories represent a convenient and familiar linguistic device by which courts, including our Court, have characterized their review under *Anderson*, we note that *Anderson* promulgated a less categorical system of classification. See *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (noting that the full Court agreed in *Anderson* that "a more flexible standard applies."). Put another way, ballot access cases should not be pegged into the three aforementioned categories. Rather, following *Anderson*, our scrutiny is a weighing process: We consider what bur- den is placed on the rights which plaintiffs seek to assert and then we balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiffs' rights be burdened. Only after weighing these factors can we decide whether the challenged statute is unconstitutional. *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. Consequently, we will look at the nature of the rights involved here and the burdens imposed by Pennsylvania election law on minor political parties in order to determine if the burden is justified. *Rogers v. Corbett*, at 460–61.

## ORDER

AND NOW, this 8th day of September, 2006, the Preliminary Objection filed by Candidate concerning the constitutionality of Section 951 under the United States and Pennsylvania Constitutions is overruled.

The Court is of the opinion that our order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an intermediate appeal from our order may materially advance the ultimate termination of the matter. Therefore, we shall certify this matter for appeal by permission pursuant to 42 Pa.C.S. § 702(b) and Pa. R.A.P. 1311(b).

In the event that a petition for permission to appeal is filed and granted, the Court further concludes that it retains jurisdiction to proceed in this matter under Pa. R.A.P. 1701(c) unless otherwise ordered by the Pennsylvania Supreme Court.