**[J-61-2018] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| WORKING FAMILIES PARTY, CHRISTOPHER M. RABB, DOUGLAS B. BUCHHOLZ, AND KENNETH G. BEISER, | : : : : | No. 34 EAP 2017 |
| | : | Appeal from the order of |
| | : : | Commonwealth Court entered on September 18, 2017 at No. 435 MD |
| Appellants | : : | 2016. |
| | : | |
| v. | : | ARGUED:  September 25, 2018 |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, ROBERT TORRES, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA AND JONATHAN M. MARKS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER, BUREAU OF COMMISSIONS, ELECTIONS AND LEGISLATION, DEPARTMENT OF STATE, COMMONWEALTH OF PENNSYLVANIA, | : : : : : : : : : : : : : : | |
| | : | |
| Appellees | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                    **DECIDED:  June 5, 2019**

Any jurist who proposes to upset established practices and norms in an area as dependent on stability as election procedure does so only with considerable reluctance. As well, this Court imposes a substantial burden upon anyone who seeks to establish that a duly-enacted law is unconstitutional, in view of our presumption that the General Assembly's enactments are constitutional.  *See* Maj. Op. at 14-15 (quoting *DePaul v. Commonwealth*, 969 A.2d 536, 545-46 (Pa. 2009)).   This thumb on the scales

notwithstanding, I nonetheless would hold that the anti-fusion provisions of the Election Code[1] substantially burden fundamental constitutional rights in ways that are not outweighed by the government interests at stake. The circumstances presented by this case illustrate to my satisfaction that the operation of the anti-fusion provisions before us infringes upon Pennsylvania voters' and candidates' right to free and equal elections under the Pennsylvania Constitution. *See* PA. CONST. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."). Accordingly, I respectfully dissent.[2]

As the Majority's account ably relates, at issue in this case is the Working Families Party's ("WFP") desire to nominate Christopher M. Rabb for a seat in the Pennsylvania House of Representatives, an office for which Rabb obtained the nomination of the Democratic Party by prevailing in that party's primary election.[3] After the primary election was completed, Rabb filed papers with sufficient signatures to secure the WFP nomination,[4] but Rabb crossed out and disclaimed the statutorily-prescribed affirmation

---

[1] Act of June 3, 1937, P.L. 1333, *codified as amended at* 25 P.S. §§ 2600-3591; *see* 25 P.S. § 2911(e)(5) (precluding the filing of political body nomination papers where the candidate's name has "been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election" or he has "been nominated by any other nomination papers filed for any such office"), *deemed unconstitutional as applied to a different matter by Constitution Party of Pa. v. Cortes*, 824 F.3d 386 (3d Cir. 2016); *see also* Maj. Op. at 3-4 nn. 2, 3 (reviewing the suite of additional Election Code provisions that pertain to this restriction).

[2] I concur in the Majority's analysis only inasmuch as I agree that Appellants timely filed their appeal in this matter. *See* Maj. Op. at 13-14.

[3] Hereinafter, I refer to WFP, Rabb, and the voter-Appellants collectively as "WFP." Similarly, I refer to the various Appellee Commonwealth parties as "the Commonwealth."

[4] As a "political body" rather than a "political party" under Pennsylvania law, WFP was denied access to the primary process and was required to seek nomination by petition. *See generally* 25 P.S. § 2831; *see also* Maj. Op. at 5.

that he was not, at the time of submission, the nominee of any other political party or body.  *See* Maj. Op. at 2.

Although Pennsylvania law precludes cross-nominations (*i.e.*, "ballot fusion") by this method, this Court's decision in *Appeal of Magazzu*, 49 A.2d 411 (Pa. 1946), provided a narrow exception to the statutory rule.  In *Magazzu*, this Court held that cross-nomination may be achieved by primary write-in vote.  Accordingly, a candidate seeking the nominations of two major parties, *i.e.*, those admitted to the primary process because they achieved a prescribed quantum of support in a prior election, may seek the nomination of one such party by winning its primary while pursuing the nomination of another major party by winning that party's primary through the write-in votes of that party's registered electors.  A candidate seeking the nominations of a major party and a political body also may avail himself of this option by submitting a qualifying petition for the political body in advance of the primary and securing a write-in victory in the major party's primary.

WFP and Rabb, as well as two qualified electors, sought declaratory relief on the basis that the anti-fusion provisions, as qualified by our ruling in *Magazzu*, violated the Free and Equal Elections Clause, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution,[5] and Article I, Sections 7 and 20 of the

---

5   "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV.

Pennsylvania Constitution, which protect, respectively, the freedoms of expression and association.[6]

## I.  Political Parties and Ballot Fusion in the American Electoral System

### A.  Political Parties Generally

There is widespread agreement that political parties serve an important and salutary role in American democracy.  The United States Supreme Court has spoken forcefully in defense of the values promoted by political associations in the form of parties, and has noted that seeking victory is one, but not necessarily the only, reason that a political party may venture a nominee in a given election:

> It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments.  Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences.

*Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) (internal quotation marks and citations omitted).  In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Court explained:

> By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, [ballot] restrictions [that disadvantage minor parties] threaten to reduce diversity and competition in the marketplace of ideas.  Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time

---

[6] Article I, Section 7 provides, in relevant part, "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."  PA. CONST. art. I, § 7.  Section 20 provides, "The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance."  PA. CONST. art. I, § 20.

made their way into the political mainstream. *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 186 (1979). In short, the primary values protected by the First Amendment—"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)—are served when election campaigns are not monopolized by the existing political parties.

*Anderson*, 460 U.S. at 794 (citations modified); *see Williams v. Rhodes*, 393 U.S. 23, 31 (1968) (noting that "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes"); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 352 (2003) (Rehnquist, J., dissenting), *overruled by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ("[S]ome national parties exist primarily for the purpose of expressing ideas and generating debate.").[7]

---

[7] Professor Dimitri Evseev trenchantly has observed:

A jurisprudence that takes the expressive aspects of voting into account would be quite different from the Supreme Court's current approach. Today, the Justices may believe that third parties contribute little more than confusion to elections. This view makes sense if the only purpose of elections is the selection of office-holders, since third-party candidates are usually not electable. However, if voting is reconceptualized as a broader political statement of support for or rejection of a particular candidate or agenda, then the ballot becomes inseparable from the larger arena of democratic politics, in which dissenting minority voices are integral to healthy debate.

When the two major parties agree on a particular issue, public discourse about it may be virtually eliminated in the absence of a strong third voice. Even when the two parties disagree, they may collude to avoid topics that each of them finds politically damaging. Third parties thus liven public debate by broadening the range of topics and positions to which the electorate is exposed.

*See* Dimitri Evseev, *A Second Look at Third Parties: Correcting the Supreme Court's Understanding of Elections*, 85 B.U. L. REV. 1277, 1308 (Dec. 2005) (footnotes omitted).

In *Minnesota Fifth Congressional District Independent-Republican Party v. State*, 295 N.W.2d 650 (Minn. 1980), the Minnesota Supreme Court described the important function that political parties play in facilitating effective political association of the sort the Framers sought to enable and protect:

> The Constitution protects political association as well as individual political expression.  One of those precious associational freedoms is the right of "like-minded persons to pool their resources in furtherance of common political goals." *Buckley v. Valeo*, 424 U.S. 1, 22 (1976).  Political parties enjoy a constitutionally protected right of association, and any interference with that right is an interference with the rights of the party's adherents. *Cousins v. Wigoda*, 419 U.S. 477, 487 (1975).  Any restriction on either of these dual rights[,] "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively," *Williams*, 393 U.S. at 30[,] must be subject to strict judicial scrutiny.

*Minnesota Fifth*, 295 N.W.2d at 652 (citations modified).

In dissent in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), Justice Stevens defended the associational benefits of political parties and their ability to appear on the ballot:

> [A] party's choice of candidate is the most effective way in which that party can communicate to the voters what the party represents and, thereby, attract voter interest and support.  Political parties "exist to advance their members' shared political beliefs," and "in the context of particular elections, candidates are necessary to make the party's message known and effective, and vice versa." *Col. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 629 (1996) (Kennedy, J., dissenting).  *See also Anderson*, 460 U.S. at 821 (Rehnquist, J., dissenting) ("Political parties have, or at least hope to have, a continuing existence, representing particular philosophies.  Each party has an interest in finding the best candidate to advance its philosophy in each election").

*Timmons*, 520 U.S. at 372 (Stevens, J., dissenting) (citations modified; footnote omitted).

And in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), the Court amplified Justice Stevens' observations regarding standard bearers in the strongest of terms: "[i]t is the nominee who becomes the party's ambassador to the general electorate in winning

it over to the party's views." *Id.* at 575; *see In re Jones*, 476 A.2d 1287, 1299 (Pa. 1984) (citing *Anderson*, *supra*; *Lubin v. Panish*, 415 U.S. 709 (1974)) (noting that parties are "desirous of selecting a standard bearer who shared their political views and who could best articulate their needs and aspirations").

Moreover, in *Williams*, the High Court made clear that not only the party system itself warranted protecting, but new and minor parties, as well, are entitled to protections from the duopolistic hegemony of two dominant parties. In finding that the restrictions under review in that case not only favored a two-party system, but in fact favored Democrats and Republicans specifically, the Court underscored that "[n]ew parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Williams*, 393 U.S. at 32.

There is no better evidence for the fundamental value the Court recognizes in association and expression through political parties than in its persistent application of elevated scrutiny to direct incursions upon those rights. Thus, in *Eu*, and *Williams*, among others, the Court applied strict scrutiny to infringements upon the associative rights attendant to political parties and their constituents. Accordingly, the Court in *Eu* and *Williams* demanded that such infringements serve a compelling governmental interest.

B.    Ballot Fusion[8]

Ballot fusion—the practice of a candidate running in an election as the nominee of more than one political party—was the norm rather than the exception in American

---

[8]    The following discussion relies upon my sampling of the voluminous scholarship on this and related issues. Except where otherwise indicated, my account is drawn

electoral politics until early in the twentieth century. When fusion was the norm, "third" parties—*i.e.*, parties other than the Democratic and Republican parties[9]—were more numerous, more widespread, and more influential than their modern counterparts. Indeed, from Reconstruction through World War II, third parties, by banding together with the larger Democratic and Republican parties, wielded considerable, sometimes decisive, power in elections at the state and even national levels. At various pinnacles in their history, these alliances influenced major parties to adopt policy positions favorable to minor parties in order to ensure the latters' support, and even induced the former to withdraw candidates for certain races in favor of third-party candidates so as to secure third-party support for major party candidates in other races.

Concerns about fusion and the proliferation of minor parties, as well as various forms of fraud,[10] led first to the widespread replacement of the party ballot system—in

principally from the following sources: Howard A. Scarrow, *Duverger's Law, Fusion, and the Decline of American "Third" Parties*, THE WESTERN POLITICAL QUARTERLY vol. 39, no. 4, 634 (Dec. 1986); and Peter H. Argersinger, *"A Place on the Ballot": Fusion Politics and Antifusion Laws*, THE AMERICAN HISTORICAL REVIEW vol. 85, no. 2, 287 (April 1980). I have consulted various additional sources, which echo and add to Scarrow's and Argersinger's accounts. *See* Dimitri Evseev, *supra* n.7; Elissa Berger, Note, *A Party that Won't Spoil: Minor Parties, State Constitutions and Fusion Voting*, 70 BROOK. L. REV. 1381 (2005); Daniel R. Ortiz, *Duopoly Versus Autonomy: How the Two-Party System Harms the Major Parties*, 100 COLUM. L. REV. 753 (April 2000); James Gray Pope, *Fusion, Timmons v. Twin Cities Area New Party, and the Future of Third Parties in the United States*, 50 RUTGERS L. REV. 473 (Winter 1998); Richard L. Hasen, *Entrenching the Duopoly: Why the Supreme Court Should Not Allow the States to Protect the Democrats and Republicans from Political Competition*, 1997 SUP. CT. REV. 331 (1997).

[9]     Although Pennsylvania law distinguishes primary parties from petitioning parties as "political parties" and "political bodies," respectively, for purposes of discussion I rely principally upon the terminology of "major parties" and "minor parties," occasionally referring to the latter as "third parties."

[10]     *See* Ortiz, *supra* n.8, at 767-769.

which partisan electioneers provided completed ballots to voters—in favor of a government-funded, standardized "Australian ballot." In granting control to the governing body of the fashion in which candidates for election were presented to the electorate, the Australian Ballot facilitated the introduction of increasingly restrictive ballot access provisions, both salutary and repressive, including requiring candidates to demonstrate sufficient pre-election support through petition requirements and fostering broad adoption of laws designed to eliminate then-common ballot-fusion practices in favor of channeling candidates into seeking the nomination of one of the dominant parties.[11]

After the adoption of the Australian ballot but before ballot fusion was broadly eradicated, cross-nominations were reflected on the ballot in either of two general ways. Some jurisdictions adopted what some call an "office bloc" approach to the general election ballot, listing each candidate for a given office only once, with all party affiliations appearing adjacent to the candidate's name. Thus, a candidate nominated by more than one party would appear only once, with each of the nominating parties appearing next to his name. This is the approach that prevails now in Pennsylvania for cross-nominated candidates. *See* 25 P.S. § 2963(d).

Other jurisdictions employed a variation on the "party column" method. On a party column ballot, a cross-nominated candidate appears on as many separate lines as he has party nominations, enabling voters not only to vote for a candidate, but, in doing so, to signal under which party's aegis the voter cast the vote. In this fashion, the voter can

---

[11] The Australian Ballot also provided a means to prevent chicanery endemic to the party ballot system, including protecting the privacy of the ballot, and preventing political parties from distributing ballots that looked like the slate of another party but actually listed the candidates of the distributing party. *See* Berger, *supra* n.8, at 1388.

indicate not only which candidate he favors, but also which party he chooses to endorse with his vote. New York, one of a handful of states that long have permitted ballot fusion in one form or another, employs the party column method.[12]

While the accounts of the intent underlying anti-fusion statutes are manifold, and while these accounts differ substantially,[13] research regarding the results that followed the introduction of anti-fusion legislation has been more consistent, supporting the narrative that anti-fusion regulations were mechanisms by which dominant parties

---

[12]     WFP describes office bloc ballots and party column ballots, respectively, as "aggregated" and "disaggregated" ballots, a more descriptive choice that I adopt for the remainder of this Opinion.

[13]     One term that recurs frequently in multiple guises, one which is cited by the Commonwealth in this case, is "party-raiding." Definitions of this term vary. In *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986), as well as in the Commonwealth Court's decision in this case, the Court identified party-raiding as occurring when "voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Id.* at 219. In other cases, courts have credited government interests in imposing ballot restrictions out of concern that "splintered parties and unrestrained factionalism may do significant damage to the fabric of government." *Storer v. Brown*, 415 U.S. 724, 736 (1974). In *Bullock*, *supra*, the Court recognized a legitimate interest in "regulating the number of candidates on the ballot," "prevent[ing] the clogging of its election machinery, avoid[ing] voter confusion," and protecting "the integrity of [the state's] political processes from frivolous or fraudulent candidacies." *Id.* at 145; *accord In re Street*, 451 A.2d 427, 430 (Pa. 1982) (suggesting that the true intent of the anti-fusion provisions was "to prevent the election ballot from being cluttered by candidates who are seeking to multiply the number of times their name appears on the ballot under various inviting labels" by limiting each person to appearing as the nominee of only one party). However, the Supreme Court astutely has observed that a "State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Eu*, 489 U.S. at 228 (quoting *Tashjian*, 479 U.S. at 221; *Anderson*, 460 U.S. at 798). On at least one occasion, a Pennsylvania court has taken a more cynical view, albeit one consistent with the history of such provisions: "Our review of the history of ballot access for minor parties in Pennsylvania reveals what we view as the legislature's intent to make ballot access by these parties difficult, under the guise of maintaining an 'uncluttered' ballot." *In re Nomination Papers of Rogers*, 908 A.2d 948, 955 (Pa. Cmwlth. 2006).

consolidated their power at the expense of minor parties. Professor Argersinger has conducted statistical analyses supporting the conclusion that, across multiple elections in multiple jurisdictions, where candidates were allowed to run as the nominee of more than one party and appeared on separate ballot lines for each such nomination (disaggregated ballot), they received more votes than if they appeared as the nominee of more than one party but their name appeared on only one line of the ballot with all nominating parties listed beside them (aggregated ballot), and that such candidates received fewer votes still if they were denied cross-nomination entirely, appearing as the nominee of only one of the dominant parties. Professor Argersinger further concluded that voter turnout diminished on the same continuum. *See* Argersinger, *supra* n.8, at 293-95; *see also* Berger, *supra* n.8, at 1388-90. In any event, Pennsylvania reflects the norm rather than the exception in substantially barring cross-nomination. Fewer than ten states allow ballot fusion, and only New York widely is recognized for having a political environment where ballot fusion plays an important role in electoral politics. *See generally* Berger, *supra* n.8, at 1390-92.[14]

## II.     Robert and Roberta Seek Cross-Nominations

After *Magazzu*, Pennsylvania's *status quo* is somewhat unusual, perhaps unique, in recognizing a significant exception to its textually categorical ban on cross-nominations.[15] This anomaly substantially informs WFP's arguments as to why the

---

[14]     New York's system, in particular, has received a great deal of scholarly attention. *See*, *e.g.*, Berger, *supra* n.8, at 1391-92.

[15]     The persistence of the *Magazzu* exception cannot be written off as ephemeral or as mere oversight. *Magazzu* has been on the books for over seventy years, and on WFP's undisputed account, in just the last decade, over a hundred candidates statewide have successfully utilized the exception to appear on a general election ballot as the

collective effect of Pennsylvania's anti-fusion regulations offends the Pennsylvania and United States Constitutions. It is perhaps easiest to illustrate WFP's concerns with a hypothetical example.

Robert, a self-identified "centrist," seeks the nominations of both the Democratic and Republican parties in his 2022 campaign for Governor of Pennsylvania. A lifelong Democrat by registration, he pursues that party's nomination by taking the steps necessary to secure a place on that party's primary ballot. To do so, he must collect two thousand signatures in the three-week period between the thirteenth Tuesday before the primary election and the tenth Tuesday before the primary.[16] A longtime Democratic politician, he collects the signatures with ease. Meanwhile, Robert vigorously makes his case for a write-in vote to Republican voters. With a crowded Republican field from which no frontrunner has emerged as the primary approaches, Robert's effort gains traction.

Roberta, also a long-time registered Democrat but of a more liberal bent, also enjoys enough party support to believe that she would defeat Robert for the party's nomination in the same race were she to appear on the Democratic Party's primary ballot. However, by Roberta's calculations, a candidate who runs as a more liberally-inclined Democrat in the general election will face an uphill electoral battle against the Republican nominee, especially because a third party, True Blue, recently has emerged to advocate

---

nominee of both the Democratic and Republican parties. *See* Brief for WFP at 24 (asserting that, according to the Department of State's database, at least 101 candidates have achieved major-party cross-nomination). Thus, one can only conclude that the General Assembly is satisfied with the *status quo*. *Cf. Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 353 (Pa. 2014) ("[W]e assume that the General Assembly is aware of the rule, which, if unchanged by legislation, presumably reflects continued legislative policy.").

[16] For these requirements, *see* 25 P.S. §§ 2868, 2872.1, 2873.

a more aggressive approach to certain policy positions associated generally with the Democratic party and has gathered enough support for its nominees to have acted as spoilers in recent races by siphoning off Democratic votes. Thus, Roberta also seeks the support of this upstart party, which remains a political body under state law subject to the more burdensome signature requirements that apply to such a body. A substantial majority of the True Blue rank and file, for their part, believe that Roberta best embodies the party's collective values, and embrace her desire to seek their nomination in tandem with that of the Democratic Party.

If Roberta sought only the True Blue nomination, she would have from the tenth Wednesday before the primary until the second Friday after the primary (or just shy of twelve weeks) to collect a number of signatures equal to two percent of the largest vote cast for any elected candidate in the state at the last state-wide election[17] in order to secure ballot placement statewide on True Blue's behalf, bring all necessary papers together, and submit them to the Secretary of the Commonwealth. But because she also seeks the Democratic Party nomination by write-in vote (her only option if she wants the True Blue nomination), the time period that she has to collect signatures in furtherance of True Blue's nomination is foreshortened by eleven days, because if she is successful in her write-in campaign for the Democratic nomination on primary day, she forfeits the right to submit True Blue nomination materials thereafter. Thus, she must collect, organize, and validate her petitions in the ten weeks preceding the primary, to be held the third

---

[17]     For reference, Governor Tom Wolf received 2,895,652 votes in the 2018 election, two percent of which would require 57,914 signatures. *See* Department of State, https://www.electionreturns.pa.gov/General/SummaryResults?ElectionID=63&ElectionType=G&IsActive=0.

Tuesday in May, effectively forfeiting nearly two post-primary weeks that she otherwise would have to secure the tens of thousands of signatures in support of her True Blue nomination to ensure a place on the general ballot as that party's nominee.[18] Moreover, at least thirty days before the primary, she must renounce her Democratic voter registration, which will do her no favors in her write-in campaign for that party's nomination, especially against a formidable candidate like Robert.

Knowing all of this in advance, Roberta faces a wrenching choice. If she pursues the True Blue nomination, not only does she risk failing to secure the Democratic nomination by write-in, where she might have prevailed had she appeared on the ballot, but she also risks failing in her effort to secure the requisite signatures in a somewhat shorter period of time than the General Assembly has seen fit to provide political-body candidates. Moreover, if she succeeds in her write-in campaign, but fails to collect sufficient signatures in advance of the primary, she simultaneously will forfeit her eligibility to secure the nomination of the True Blue Party, deny the True Blue Party the ability to nominate its first-choice candidate, and leave True Blue with less than two weeks to collect signatures for a second-choice nominee, very likely resulting in True Blue fielding no nominee at all. And even if True Blue somehow manages to nominate a second-choice candidate, those among its members who prefer Roberta in principle will be forced to choose between supporting their preferred candidate or their preferred party in the general election.

Although Robert and Roberta each seek to utilize the *Magazzu* exception, and theoretically may do so, the decisions and logistical challenges that Roberta faces

---

[18]     For these requirements, *see* 25 P.S. §§ 2911, 2913.

manifestly are more onerous than those Robert confronts. The differences arise directly from the statutory distinctions between the nomination requirements that apply to major parties and those that apply to minor parties, which work in concert with *Magazzu* to impose a substantial practical disadvantage upon candidates seeking minor party-major party cross-nominations.

Against this backdrop, we confront WFP's several constitutional challenges to Pennsylvania's anti-fusion regulations. These challenges invoke the Free and Equal Elections Clause of the Pennsylvania Constitution, the Equal Protection Clause of Fourteenth Amendment to the United States Constitution, and Pennsylvania's protection of free political speech and assembly under Article I, Sections 7 and 20 of the Pennsylvania Constitution.

## III.     The Pennsylvania Constitution's Free and Equal Elections Clause

This Court recently and rigorously examined the import and effect of the Pennsylvania Constitution's Free and Equal Election Clause in *League of Women Voters v. Commonwealth*, explaining:

> The broad text of the first clause of [the Free and Equal Election Clause] mandates clearly and unambiguously, and in the broadest possible terms, that *all* elections conducted in this Commonwealth must be "free and equal." In accordance with the plain and expansive sweep of the words "free and equal," we view them as indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, *conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government*. Thus, Article I, Section 5 guarantees our citizens an equal right, on par with every other citizen, to elect their representatives. Stated another way, the actual and plain language of Section 5 mandates that all voters have an equal opportunity to translate their votes into representation. This interpretation is consistent with both the historical reasons for the inclusion of this provision in our

Commonwealth's Constitution and the meaning we have ascribed to it through our case law.

*League of Women Voters v. Commonwealth*, 178 A.3d 737, 804 (Pa. 2018) (emphasis added) (hereinafter "*LWV*").

We noted in that case that our Free and Equal Elections Clause has no federal counterpart, and that it appears in our Declaration of Rights, "which spells out the social contract between government and the people and which is of such 'general, great and essential' quality as to be ensconced as 'inviolate.'" *Id.* at 803 (citing PA. CONST. art I, Preamble, §§ 2, 25[19]). Thus, although our Constitution confers upon the General Assembly the power to enact laws governing elections, such enactments "may be invalidated by our Court 'in a case of plain, palpable and clear abuse of the power which actually infringes the rights of the electors.'" *Id.* at 809 (quoting *Patterson v. Barlow*, 60 Pa. 54, 75 (1869)). Accordingly, "any legislative scheme which has the effect of impermissibly diluting the potency of an individual's vote for candidates for elective office relative to that of other voters" runs afoul of the Free and Equal Elections Clause. *Id.* (citing *City Council of the City of Bethlehem v. Marcincin*, 515 A.2d 1320, 1323-24 (Pa. 1986)).

Over a century ago, in *Winston v. Moore*, 91 A. 520 (Pa. 1914), this Court provided a similarly expansive account of the Clause:

---

[19]     "All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness. For the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper." PA. CONST. art. I, § 2. "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate." PA. CONST. art. I, § 25;

> [E]lections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

*Id.* at 523. We took care in *Winston* to underscore the importance of preserving legislative prerogatives in the regulation of elections, and added that Pennsylvania courts "have never undertaken to impale legislative power on points of sharp distinction in the enactment of laws intended to safeguard the ballot and to regulate the holding of elections." *Id.* at 522. Ultimately, we upheld the statute at issue in *Winston* because it simply limited access to the general ballot to the two candidates who received the greatest number of primary votes. This Court observed that "the inconveniences if any bear upon all in the same way under similar circumstances and are made necessary by limiting the number of names to be printed upon the official ballot." *Id.* at 523.

In *LWV*, we gleaned from *Winston* that the Free and Equal Elections Clause requires an "equal, nondiscriminatory electoral process." *LWV*, 178 A.3d at 810. "[F]or our form of government to operate as intended, each and every Pennsylvania voter must have the same free and equal *opportunity* to select his or her representatives." *Id.* at 814 (emphasis in original). Adopting a broad interpretation of the Free and Equal Elections Clause "guards against the risk of unfairly rendering votes nugatory, artificially entrenching representative power, and discouraging voters from participating in the electoral process because they have come to believe that the power of their individual vote has been diminished to the point that it 'does not count.'" *Id.*

In finding that WFP's claims under the Free and Equal Elections Clause do not warrant relief, the Majority relies upon *LWV*'s putatively narrow conclusion that "the

overarching objective of this provision of our constitution is to prevent dilution of an individual's vote by mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens." Maj. Op. at 19 (quoting *LWV*, 178 A.3d at 817). The Majority notes that, in their theoretical access to the write-in cross-nomination alternative, voters and candidates who seek major party-minor party cross-nomination have "'the same right as every other voter,' and thus the foundational principle underlying [the Free and Equal Elections Clause] is not offended." Maj. Op. at 20 (quoting *Winston*, 91 A. at 523).

The Majority also cites this Court's decision in *Shankey v. Staisey*, 257 A.2d 897 (Pa. 1969), for roughly the same proposition. *See* Maj. Op. at 19. In *Shankey*, a minor party that qualified for the primary ballot submitted no candidates for inclusion on the primary ballot, but several candidates affiliated with the party won their respective primaries by write-in vote. Election officials refused to certify their elections because their write-in vote totals did not reach the number of signatures that a political body seeking ballot access by petition was required to collect, as required by statute. The *Shankey* Court found no constitutional violation because the statute merely provided that anyone seeking inclusion on the general ballot, whether through primary election or by nomination petition, was obligated to demonstrate the support of the same number of electors.

Citing the facially non-discriminatory nature of the anti-fusion regulations, and the putatively equal availability of the *Magazzu* exception to parties seeking major-major or major-minor cross-nomination, the Majority concludes that, as in *Winston* and *Shankey*, no asymmetrical burdens are imposed. The Majority further holds that, whether or not a candidate seeking cross-nomination in the fashion allowed by *Magazzu* succeeds, so

long as that candidate appears on the ballot as the nominee of one party, a supporting voter of either of the parties that sought cross-nomination may endorse, support, and vote for that candidate, and that vote is counted once, like any other voter's. Consequently, the Majority holds, the Free and Equal Elections Clause, as elucidated in *Winston*, *Shankey*, and *LWV*, is satisfied.

These cases are distinguishable. In *Winston* and *Shankey*, the challenged burdens did not create anything resembling the unequal logistical burdens at issue in the instant case. In the former, ballot access was merely limited to the top two vote-getters, whatever their affiliation, with each candidate free to campaign in precisely the same fashion for precisely the same nomination. And in *Shankey*, the law merely required a threshold showing of support to appear on the general ballot, whether that support was tallied in a primary or by nomination petition. Conversely, in *Anderson*, the Court rejected the argument that facially equal treatment of major and minor party candidates suffices where the practical burdens were greater on minor parties than on major parties. 460 U.S. at 799-801.

Furthermore, in relying upon *LWV*, the Majority plucks *LWV*'s reference to vote dilution, as such, from this Court's application of the Court's *ratio decidendi* to the specific gerrymandering challenge at issue in that case, a subject that necessary implicates vote dilution in the common sense in which that terminology typically is used. But by the text of the Free and Equal Elections Clause itself, as well as *LWV*'s account of the interests it protects, vote dilution is only *one* of the ills the Clause is designed to cure, one peculiar

to gerrymandering, at least in the modern era where one-person-one-vote is settled law.[20] The *LWV* language relied upon by the Majority reflected a case-specific application of the Free and Equal Elections Clause, but we offered that narrow formulation only after describing the Clause in bolder, more encompassing terms: "[T]he Clause should be given the broadest interpretation, *one which governs all aspects of the electoral process*, and which provides the people of this Commonwealth an equally effective power to select the representative of his or her choice, and bars the dilution of the people's *power* to do so." *LWV*, 178 A.3d at 814 (emphasis added). Suggesting that this principle applies only to vote dilution in the gerrymandering context when our general characterization cited the protection of "all aspects of the electoral process" and referred to the dilution of the "power" to "select the representative of [the voter's] choice" can hardly be characterized as the "broadest interpretation" of the Clause, nor can it be reconciled with the Clause's text or *LWV*'s express rationale.

Because political parties play a defining role in our polity, it follows that the health of our state's elections depends in part upon the ability of new political parties to emerge, be heard, and gather members. *See Williams*, 393 U.S. at 31-32. Thus, the formation of parties and their access to the ballot must be understood to be among the "aspects of the electoral process" to which the Free and Equal Election Clause's protections apply, and part and parcel of the "power" to select one's preferred candidate. Thus, I find it wholly unsatisfying to rely upon one decontextualized allusion to vote "dilution" in derogation of

---

[20] Before the United States Supreme Court enshrined the one-person-one-vote principle, vote dilution also could occur in districts encompassing more voters than other districts, resulting in the literal "dilution" of the votes of those in more populous districts relative to their counterparts in less populous districts. *See generally Reynolds v. Sims*, 377 U.S. 533 (1964).

the other concerns explicitly embraced by this Court in *LWV*—and for that matter in *Winston*.

Notably, *Winston* itself employed broader terms than the Majority allows, and it is *Winston*'s observation that elections are free and equal, in part, when no (ostensibly *other*) "constitutional right of the qualified elector is subverted or denied him," that animates the remainder of my discussion. *See Winston*, 91 A. at 523. In my view, *Winston* and *LWV* establish that the Free and Equal Elections Clause incorporates and protects other constitutional values naturally implicated by election regulations. Stated otherwise, an electoral system that denies its participants' constitutional rights cannot be called "free and equal." With these principles in mind, I turn to WFP's invocation of the federal Equal Protection Clause.

## IV. Equal Protection Under the Fourteenth Amendment to the United States Constitution

Effectively conceding the lack of a facially discriminatory aspect of the anti-fusion regulations between major parties and minor parties, WFP instead argues that the Act *as applied* to WFP in this case violates its right to equal protection under the federal Fourteenth Amendment. WFP notes that, in *Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386 (3d Cir. 2016), the United States Court of Appeals for the Third Circuit[21] affirmed the District Court's determination that a Pennsylvania statute concerning the number of signatures required of a political body to appear on a general ballot was

---

[21] In view of the Supremacy Clause, U.S. CONST. art VI, cl. 2, we are bound on matters of federal law only by decisions of the Supreme Court of the United States. Nonetheless, we generally treat the decisions of the United States Court of Appeals for the Third Circuit as persuasive authority when it has spoken to the federal question presented. *See generally Stone Crushed Partnership v. Kassab Archbold Jackson & O'Brien*, 908 A.2d 875, 883 n.10 (Pa. 2006).

unconstitutional as applied to such political bodies, despite the fact that the statute was facially non-discriminatory and constitutional in most of its applications. The court elaborated as follows:

> "The distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). That is, "[a]n 'as applied' challenge is a claim that the operation of a statute is unconstitutional in a particular case while a facial challenge indicates that the statute may rarely or never be constitutionally applied." 16 C.J.S. CONSTITUTIONAL LAW § 243; *see also United States v. Huet*, 665 F.3d 588, 600-01 (3d Cir. 2012) (same); *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir.) (same).

*Constitution Party*, 824 F.3d at 394 (citations modified).

In support of its as-applied Equal Protection challenge, WFP relies principally upon the Third Circuit's *en banc* decision in *Reform Party of Allegheny County v. Allegheny County Department of Elections*, 174 F.3d 305 (3d Cir. 1999). *Reform Party* concerned a facially discriminatory Pennsylvania law that allowed major parties to cross-nominate candidates for certain local offices while precluding minor parties from doing the same. The District Court found that the statute violated the Equal Protection Clause and granted summary judgment in favor of the minor party that challenged the statute. The Court of Appeals heard the case[22] *en banc* in the immediate wake of the Supreme Court's decision in *Timmons*, *supra*, in which the Court upheld Minnesota's anti-fusion statute—which was not unlike Pennsylvania's—against a First Amendment challenge.

The *Reform Party* court quickly rejected *Timmons* as dispositive, because, in addressing only the First Amendment, the *Timmons* Court neither offered guidance regarding the Equal Protection Clause nor vitiated prior Supreme Court case law applying

---

[22] This account skips procedural steps that do not inform the present analysis.

that clause to election regulations. In effect, all the *Reform Party* court took from *Timmons* was the principle that, in examining election laws for constitutional violations, courts must first assess the magnitude of the burden in question, and apply "less exacting review" to such burdens when they are not "severe." *Reform Party*, 174 F.3d at 311 (quoting *Timmons*, 520 U.S. at 370 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992))); *id.* at 314 (assuming that the same level of scrutiny applies to both associational and equal protection challenges to the similar electoral regulations).[23]

The court then underscored that the *Timmons* Court not only did not overrule the Court's earlier decision in *Williams*, *supra*, but in fact cited it favorably for the proposition that a governmental interest in political stability "does not permit a state to completely insulate the two-party system from minor parties' or independent candidates' competition and influence." *Reform Party*, 174 F.3d at 313 (quoting *Timmons*, 520 U.S. at 367). In *Williams*, the Court held that Ohio's election laws "made it virtually impossible for new or small political parties to be placed on the state ballot for the selection of presidential and vice presidential candidates," and thus violated the Equal Protection Clause by placing "substantially unequal burdens on both the right to vote and the right to associate." *Id.* (quoting *Patriot Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections*, 95 F.3d 253, 268 (3d Cir. 1996)); *see Williams*, 393 U.S. at 30-34.

---

[23] In Recent Cases, *Constitutional Law—Third Circuit Invalidates Statute Burdening Ballot Access on Equal Protection Grounds—Reform Party of Allegheny County v. Allegheny County Department of Elections, 174 F.3d 305 (3d Cir. 1999) (en banc)*, 113 HARV. L. REV. 1045 (Feb. 2000), the author notes that, since the *Anderson* Court limited strict scrutiny review of election regulations to instances where the burdens are "severe," "the Court has invariably refused to categorize burdens on plaintiffs' associational rights as severe," *id.* at 1045, an observation that, as best I can tell, remains true nineteen years later.

To assess the applicable level of scrutiny, the *Reform Party* court noted that it was bound first to assess the impact of the challenged laws on the rights burdened. In *Illinois State Board of Elections*, the High Court held that ballot access restrictions burden two distinct and fundamental rights, *i.e.*, the right of individuals to associate to further political beliefs and the right of qualified voters to cast effective votes, and consequently must be subject to some degree of elevated scrutiny. *Reform Party*, 174 F.3d at 314; *see Illinois State Bd. of Elections*, 440 U.S. at 184. Turning to the facially discriminatory ban on cross-nomination before it, the Court of Appeals noted that banning minor-party cross-nomination burdened supporters of that party by forcing them to choose one of "three unsatisfactory alternatives: 'wasting' a vote on a minor party candidate with little chance of winning, voting for a second-choice major party candidate, and not voting at all." *Id.* (quoting *Patriot Party*, 95 F.3d at 269).[24] The ban also burdened a minor party, as such, by "prohibit[ing the] party from nominating its best candidate and from forming a critical type of consensual political alliance that would help it build support in the community." *Id.* The ban thus served to "entrench the decided organizational advantage that the major parties hold over new parties struggling for existence." *Id.* However, the court noted, in *Timmons*, the Supreme Court confronted similar burdens and deemed them insufficiently severe to trigger strict scrutiny. Consequently, the *Timmons* Court applied an "intermediate" level of scrutiny, pursuant to which "the State's asserted regulatory

---

[24] This tripartite understanding of the choice faced by minor party voters whose chosen candidate is either denied access to the ballot entirely or allowed on the ballot only as the nominee of another party appears in this form and other guises throughout the scholarship on the subject.

interests need only be 'sufficiently weighty to justify the limitation' imposed on the [minor party's] rights." *Id.* (quoting *Timmons*, 520 U.S. at 364).

The court concluded that it must "weigh, against the burdens imposed, any plausible justification the State has advanced for imposing unequal burdens on major and minor parties," quoting the Supreme Court's own admonition that, "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Id.* at 315 (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)); *see Bullock v. Carter*, 405 U.S. 134, 145 (1972) ("[E]ven under conventional standards of review, a State cannot achieve its objectives by totally arbitrary means; the criterion for differing treatment must bear some relevance to the object of the legislation."). Eschewing speculation about plausible justifications as inappropriate to the application of intermediate scrutiny, the court held that it "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Reform Party*, 174 F.3d at 315 (quoting *Anderson*, 460 U.S. at 789). "Unlike rational basis review," the Supreme Court has held, its standard "does not permit us to supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).[25]

Election officials proposed four important government interests: preventing "sore loser" candidacies, preventing individual candidates from monopolizing the ballot,

---

[25] This formulation of intermediate scrutiny contrasts with the most permissive accounts of rational basis review, under which courts are encouraged to consider any reasonable basis for a challenged law, not just those proposed by the law's proponent. *See Pa. Liquor Control Bd. v. Spa Athletic Club*, 485 A.2d 732, 735 (Pa. 1984) (imposing the burden of demonstrating the lack of a rational basis upon the challenger, and noting that it is not "incumbent upon the government agency to advance the reasons for the act in defending the classification").

preventing major party candidates from "bleeding off" independent voters, and encouraging new candidates to run as independents. The court found that the first rationale was "too broad and too narrow": too narrow because the law only prevented a candidate who lost in a major party primary from later running as a minor-party candidate, and too broad because it prevented minor-party cross-nomination of candidates who did *not* lose a primary. *Id.* at 317. With respect to the concern for ballot-monopolization, the court noted that the laws in question only prevented cross-nomination by minor parties, leaving the door open to "ballot-clogging" by major-party cross-nomination. The third rationale was unpersuasive because cross-nomination ostensibly would increase a major party's share of minor party votes only where the minor party *elected* to anoint a major party candidate as its own and its voters preferred the major-party candidate. Regarding the fourth rationale, the court observed that the same discouragement of independent candidacies would result, perhaps to a *greater* extent, when the major parties cross-nominated a candidate. For want of a weightier state interest, the court held that the challenged statute, as applied to minor parties, violated the Equal Protection Clause of the Fourteenth Amendment.

WFP asks us to extend *Reform Party*'s reasoning to its as-applied Fourteenth Amendment challenge. WFP invokes the Robert-and-Roberta scenario as demonstrating the discriminatory effect of the anti-fusion regulations as qualified by this Court's decision in *Magazzu*. WFP cites state records demonstrating dozens of instances in recent years of candidates achieving major-party cross-nomination through the *Magazzu* exception, which records furnish no evidence that even one major party/political body cross-nomination has been achieved through the same exception. Brief for WFP at 24. Echoing

the *Reform Party* court's express concern with the "three unsatisfactory alternatives" afforded a minor-party voter who is denied recourse to cross-nomination, WFP argues that "American law long recognized fusion as a simple way to allow supporters of the program of non-major-parties to vote their values without wasting their votes." *Id.* at 43 (internal quotation marks omitted). WFP argues that, in effect and by design, the anti-fusion regulations "guard the incumbent two-party duopoly from competition." *Id.* at 44 (citing *In re Nomination Papers of Rogers*, 908 A.2d 948, 955 (Pa. Cmwlth. 2006) (noting "the legislature's intent to make ballot access by [minor] parties difficult, under the guise of maintaining an 'uncluttered' ballot")).

The Commonwealth responds principally by characterizing WFP's argument not as a specific, as-applied challenge under the Fourteenth Amendment's Equal Protection Clause, but rather as a generalized "constitutional" challenge, a self-serving premise that enables it to treat *Timmons* as dispositive, despite the fact that *Timmons* did not address the Equal Protection Clause at all. *See* Brief for Commonwealth at 29 ("In *Timmons*, the United States Supreme Court determined that an anti-fusion law similar to that of Pennsylvania met constitutional muster.").[26] Nonetheless, effectively conceding that intermediate scrutiny applies, the Commonwealth ventures that it has articulated "important reasons" to support barring ballot fusion. First, the Commonwealth contends that such restrictions "prevent[] major party candidates from interfering with the ability of smaller political bodies from being able to choose their own candidates." *Id.* Second, the

---

[26] One article has criticized "the Supreme Court's preference for evaluating ballot access restrictions solely under the First Amendment," because it "may have obscured the fact that some discriminatory statutes may create burdens that cannot withstand scrutiny under equal protection review." Recent Cases, *supra* n.23, at 1049.

law enables election officials "to determine the amount of actual support political bodies enjoy for the purpose of conferring 'political party' status for future elections." *Id.* (emphasis omitted).

The Commonwealth acknowledges that the Supreme Court has found Equal Protection Clause violations in laws that imposed "significant obstacles for minor party or independent candidates obtaining ballot access," citing *Williams*, *Anderson*, and *American Party of Texas v. White*, 415 U.S. 767 (1974), which concerned omissions of minor-party candidates from absentee ballots. Brief for Commonwealth at 31. However, the Commonwealth maintains that, with respect to the challenged law, "any burden is minimal and certainly much smaller than in those cases where a candidate was denied access to the ballot altogether," contrasting that circumstance with the fact that Rabb appeared on the ballot in the race presently at issue, albeit only as the nominee of the Democratic Party. *Id.* Despite the omission from the ballot of any indication of WFP's endorsement, the party "could still endorse him, campaign for his election and contribute money to his campaign." *Id.* at 31-32. Similarly, WFP members remained free to support him and vote for him on Election Day.

The Majority offers only a brief discussion of an argument that strikes me as worthy of more detailed consideration. In particular, the Majority only briefly summarizes *Reform Party* without distinguishing it from this case.[27] While the Majority correctly rejects as

---

[27] The most obvious distinction would be that, unlike in this case, the law in *Reform Party* facially discriminated in expressly denying cross-nomination to minor parties but allowing it for major parties. However, setting aside that this is no answer to the argument that the laws here at issue, *as applied*, create a similarly discriminatory effect, it also overlooks—as have the parties, the lower court, and the Majority—that the *Magazzu* exception applies only when a candidate seeks to cross-nominate with a major party and

speculative the Commonwealth's insistence that the anti-fusion regulations protect against major-party "raiding" of minor party's nomination processes, Maj. Op. at 23 n.9, it accepts with little discussion the weightiness of the Commonwealth's interest in its ability to tabulate votes by party for purposes of classifying political organizations in subsequent elections. In doing so, the Majority tacitly accepts what amounts to the Commonwealth's argument that there cannot be a constitutional violation, because, if there were, problems might emerge in administering the Election Code in its present form. However, our Constitution owes no solicitude to statutory mandates; statutes follow constitutions, not the other way around.

The Commonwealth also fails to acknowledge that the statutory *solution* to the statutory problems it identifies is circumvented by the *Magazzu* exception with some regularity, evidently without severely disrupting the operation of the Election Code. For example, in certain local races cross-nomination is expressly allowed by means other than write-in vote. Furthermore, candidates for state and local elections wherein fusion is barred somewhat regularly attain cross-nomination by write-in under the *Magazzu* exception. In either instance, under Pennsylvania's aggregated system, the cross-nominated candidates appear on the ballot only once with both parties' nominations

a minor party, because it only works when the major-party nomination is secured by primary write-in vote. Conversely, a candidate seeking the nomination of more than one minor party has no recourse to *Magazzu*. Similarly, a party who successfully secures the nomination of one minor party in advance of the primary may be cross-nominated by a major party by write-in primary victory, but may not secure the nomination of a second minor party. This specific scenario is not at issue in this case, but it calls into question the Commonwealth's and the Majority's presumption that the anti-fusion regulations combined with the *Magazzu* exception are not unconstitutional as applied because every candidate seeking fusion has recourse to that exception. That proposition is simply false with respect to parties seeking the nomination of more than one minor party.

adjacent to their names. How does the Commonwealth tabulate votes to determine party status when cross-nominations occur in those races? For more than seventy post-*Magazzu* years the General Assembly evidently has seen no need to address that scenario by amending the Election Code.

Perhaps those cross-nominations, which invariably involve the two major parties, cause no practical concern because no serious question is broached regarding the status of those major parties as such. However, with the party-raiding rationale duly set aside, the Commonwealth's entire argument rests upon the availability of the *Magazzu* exception to political bodies seeking to cross-nominate a major-party nominee. If, perchance, a political body ever succeeds in nominating its candidate in advance of the primary, and that candidate then manages to win a major-party write-in campaign, the problem with tallying party support cited by the Commonwealth in support of the fusion ban would come to pass, not to mention the stated ill of enabling a minor party to ride the coattails of a major party to elevate its status. Thus, not only is the Commonwealth's asserted interest one that can be addressed with any number of statutory alternatives, it also is one that will be undermined in the event that the supposed release valve for the discriminatory effect of these laws ever opens. Applying intermediate scrutiny, I would hold that the underinclusiveness of the anti-fusion regulations, combined with available (and, in fact, superior) statutory alternatives to the stated government interests, are fatal to those regulations.

**V. Conclusion**[28]

At issue here, as set forth above, are fundamental issues pertaining to the effective power of individual voters' and political parties' political and electoral influence, the fundamental fairness of the system with respect to these rights, and the permissibility of regulations that plainly impose asymmetrical burdens on voters and parties based upon nothing more than numerosity and relative popularity—which in part are determined by a self-reinforcing system in which political power begets more political power to the manifest exclusion of marginal and minority political coalitions and dissenting perspectives. Our Supreme Court has found statutes that so entrench power in major parties to the exclusion of minor parties to violate the Equal Protection Clause. *See, e.g., Williams*, 393 U.S. at 30-34. For reasons stated above at length, it seems clear to me that WFP's claims under the Free and Equal Elections Clause and the Equal Protection Clause warrant the application *at least* of intermediate scrutiny for purposes of review, and that the anti-fusion regulation fails to survive such scrutiny.

While the Commonwealth separately parries each of WFP's discrete constitutional challenges to Pennsylvania's anti-fusion regulations, at the heart of its defense lies a critical contradiction. The Commonwealth—and the Majority, following the

---

[28] I decline to address at length WFP's speech and association arguments under Article I, Sections 7 and 20 of the Pennsylvania Constitution. This is not necessarily because I find these arguments unpersuasive. Because I find sufficient grounds for relief under the Pennsylvania Constitution's Free and Equal Elections Clause and the Equal Protection Clause of the United State Constitution's Fourteenth Amendment, it is unnecessary to consider whether the Pennsylvania Constitution's considerable protections for political speech and assembly furnish a separate basis for relief in this case. Indeed, it is not clear to me, at least when it comes to ballot restrictions, that Article I, Sections 7 and 20, ever would furnish relief where the Free and Equal Elections Clause did not.

Commonwealth's lead—rely upon the dubious premise, which is contradicted by Supreme Court precedent and undermined by our decision in *LWV*, that the exclusive constitutional interest of a political body like WFP and its constituent members lies in the right to endorse, support, and vote for the candidates of their choosing. Thus, even if WFP was denied the opportunity to nominate Christopher Rabb, the Commonwealth asserts that its rights were vindicated by his appearance on the ballot under a major party mantle, where WFP could support him and its adherents could cast their ballots in his favor. In this fashion, the Commonwealth insists that the inherent value, and the protectable right, of a voter's exercise of the franchise lies solely in its effect on the ultimate victor, and that the voter has no correlative interest in signaling the party he or she prefers.

At the same time, however, the Commonwealth maintains that the important government interest that the anti-fusion regulations protect is the Commonwealth's interest in tallying popular support for each party and political body in a given election, because the data collected dictate each party's status for purposes of the next election. With these data, the Commonwealth determines which political groups will have the advantage of participating in the primary system and appearing on the general ballot without the burden of collecting a high number of signatures, and which parties will be relegated to the petition-gathering requirements imposed upon minor parties.

Distilled to its essence, then, the Commonwealth simultaneously asserts that the tallying of votes by party serves an important government interest, while conversely arguing that the parties have no countervailing interest in ensuring, precisely by means of that tabulation, that its members simultaneously may vote for their first-choice

candidate while ensuring that their votes also reflect their desired party affiliation. Put more simply still, on the Commonwealth's account, it is important that the Commonwealth be able to determine which parties the people favor so that ballot access reflects the ostensible quantum of support, but the very voters that this system is intended to benefit have no interest in having their votes properly categorized for precisely that purpose.

But the dilemma facing minor-party voters is even worse than it appears. In its dependence on vote percentages in each election, party classification is determined based upon an equation in which the numerator is the number of votes tallied for a given party's nominee and the denominator is the total number of votes cast in the election. If forced to choose between voting his first-choice candidate without the desired affiliation or his second-choice candidate as the nominee of his preferred party, the voter must choose between voting for whom he believes to be the candidate who best embodies his political values or casting a ballot in furtherance of the success of the party with which he identifies. Should the voter choose to vote candidate rather than party, his vote *adversely* affects his favored party in its quest to improve its status under Pennsylvania law. When a party member votes for the nominee of another party, not only does he reduce the numerator by not furnishing a vote for his chosen party, he also *increases the denominator* by casting a vote that effectively supports another party for classification purposes, with the practical effect of *reducing* his party's likelihood of elevating its status in the next election.

There is no avoiding the degree to which my view, were it to prevail, would disrupt the *status quo*. Absent legislative action, the Commonwealth would be compelled to allow cross-nomination without regard to prior party nomination and to include next to each

candidate's name all party affiliations, pursuant to its reliance upon the aggregated ballot. This would, indeed, confound the Commonwealth's approach to tallying party support for purpose of determining a given party's status as a major or minor party in future elections. However, difficulties with the statutes as they currently are fashioned are immaterial to the importance of rectifying constitutional errors in service of our paramount duty to vindicate fundamental rights.

Were my view to prevail, I would hope that the General Assembly would act quickly to enact reasonable regulations in service of ballot control, the prevention of voter confusion, and political stability that do not infringe upon constitutional requirements. New York's long experience with its version of the disaggregated ballot demonstrates that there is at least one method of allowing party fusion that has not created untenable voter confusion and has not palpably tilted the scales in favor of cross-nominated candidates, except, perhaps, inasmuch as the endorsement of more than one party signals a broader coalition of supporters. There almost certainly are others. *Cf. Kusper v. Pontikes*, 414 U.S. 51, 61 (1973) (noting that the availability of less drastic means to a given regulatory end militate in favor of finding a constitutional violation in less restrained efforts to achieve the same ends).

The Free and Equal Elections Clause is compromised where the regulatory approach adopted by the legislature has the well-documented effect of reducing voter access to alternative viewpoints, limiting voters' ability to tangibly support their chosen political party, and depressing voter enthusiasm and participation. It is not enough to rely upon facial equality to justify overlooking practical impediments that disproportionately affect smaller parties to the clear benefit of major parties, especially where the rationales

offered in support of regulations that have such an effect are not more clearly tailored to, or effective in advancing, the stated goals. *Cf. Buckley*, 424 U.S. at 97-98 ("Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in *Williams v. Rhodes* . . . .").

Thus, I respectfully dissent.

Justice Donohue joins the concurring and dissenting opinion.